**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **WINDSOR COURT HOTEL PARTNERS, L.L.C.,** | § | |
| **PLAINTIFF,** | § | |
| | § | |
| **V.** | § | **CASE NO. 3:25-CV-2813-E-BK** |
| | § | |
| **ARCH SPECIALTY INSURANCE COMPANY AND LANDMARK AMERICAN INSURANCE COMPANY,** | § | |
| **DEFENDANTS.** | § | |

**FINDINGS, CONCLUSIONS AND RECOMMENDATION OF THE UNITED STATES MAGISTRATE JUDGE**

Pursuant to 28 U.S.C. § 636(b), this action was referred to the undersigned United States magistrate judge for pretrial management, including the issuance of findings and a recommended disposition when appropriate. Before the Court are *Plaintiff's Emergency Motion to Remand, Request for Expedited Briefing Schedule, and Brief in Support Thereof*, Doc. 28, and *Plaintiff's Motion for Sanctions Pursuant to Federal Rule of Civil Procedure 11*, Doc. 50. For the reasons detailed herein, the motion to remand should be **GRANTED IN PART** and the motion for sanctions should be **DENIED**.

## I. BACKGROUND

### A. Parties and Factual Background

This action arises from an insurance coverage dispute over hurricane-related damage allegedly sustained by the Windsor Court Hotel in New Orleans, Louisiana (the "Hotel").

Plaintiff Windsor Court Hotel Partners, LLC ("Plaintiff") owns the Hotel. Doc. 20-1 at 4 [Pl.'s Second Am. Pet.]. Plaintiff alleges that, on or about August 29, 2021, Category Four

Hurricane Ida struck the Hotel, causing extensive damage to its windows, roof system, equipment, and interior. Doc. 20-1 at 6. At the time of the alleged loss, the Hotel's primary insurance layer consisted of five policies providing a combined total of $25 million in "all risk" property insurance coverage (the "Primary Policies"). Doc. 20-1 at 10. The Primary Policies were issued to Plaintiff and its affiliates, Crow Family, Inc., Crow Holdings Capital Partners, LLC, and Anatole Partners III, LLC (collectively, the "Primary Insureds"). Doc. 2-1 at 140 [Pl.'s First Am. Pet.].

The Hotel also maintained two layers of excess "named windstorm" coverage, under which Plaintiff was the sole named insured. Doc. 20-1 at 10. The first excess layer was issued by Arch Specialty Insurance Company ("Arch") and provided a $25 million policy limit in excess of the limits of the Primary Policies. Doc. 20-1 at 10 n. 4. The second excess layer, issued by Landmark American Insurance Company ("Landmark"), provided an additional $27 million in coverage after both the Primary Policies and first excess layer were exhausted. Doc. 20-1 at 10 n.4.

Following Hurricane Ida, the Primary Insureds submitted a formal claim under the Primary Policies for the Hotel's alleged hurricane-related damage. Doc. 20-1 at 19. The claim package estimated losses to the Hotel to be between $34 and $38 million—thus exceeding the limits of the primary coverage and implicating Arch's excess policy layer. Doc. 20-1 at 30.

**B. Procedural History**

On October 18, 2023, Plaintiff, together with the other Primary Insureds, filed this action in Texas state court, naming excess insurers Arch and Landmark, and five primary insurance

companies as Defendants.[1] In December 2024, more than one year after the suit was filed, and upon Arch's motion, the state court entered an order abating the case against Arch until Plaintiff and the Primary Insureds could demonstrate that their claims against it would "soon ripen." Doc. 39-7 at 2. The case remained abated against Arch until August 2025, when Plaintiff and the Primary Insureds informed the court that they had settled their claims against the Primary Insurers, thereby exhausting the Primary Policies. Doc. 29-12 at 330; Doc. 29-4, Doc. 29-5, Doc. 29-6; Doc. 29-7. In September 2025, Plaintiff filed a Second Amended Petition which dropped its claims against the Primary Insurers, leaving Arch and Landmark as the sole remaining defendants.[2] *See* Doc. 20-1, *passim*.

On October 16, 2025—less than three months before the scheduled trial date—Arch removed the action to this Court based on diversity jurisdiction under 28 U.S.C. § 1332. Doc. 1, *passim*. In its Notice of Removal, Arch asserts that although the parties were not initially diverse, the action became removable after Plaintiff filed its Second Amended Petition. Doc. 1 at 3; Doc. 39 at 15. According to Arch, the dismissal of Plaintiff's claims against the Primary Insurers eliminated the only diversity-destroying parties, leaving complete diversity among the remaining parties: Arch, Landmark, and Plaintiff. Doc. 1 at 2-4.

---

[1] The five primary insurers included Allianz Global Risk US Insurance Company ("Allianz"), Endurance American Specialty Insurance Company ("Sompo"), Continental Casualty Company ("CNA"), Starr Specialty Lines Insurance Company ("Starr"), and Westchester Surplus Lines Insurance Company ("Chubb") (collectively, the "Primary Insurers"). Doc. 2-1 at 131, 140.

[2] The Second Amended Complaint also removed the three remaining Primary Insureds as plaintiffs because they were not named insureds under the Excess Policies. Doc. 28 at 8 n.1. Thus, the Primary Insureds remain in the action only as Counter-Defendants.

Plaintiff now moves to remand, asserting several procedural defects in the removal and arguing that complete diversity is lacking because Plaintiff and Arch are both citizens of New Jersey. Doc. 28 at 9. Among the asserted procedural defects relevant here, Plaintiff contends that Arch's removal was untimely because it was filed more than one year after the action was commenced, in violation of 28 U.S.C. § 1446(c)(1). Doc. 28 at 21-26. Plaintiff also seeks an award of attorneys' fees incurred in connection with its motion to remand and separately moves for sanctions against Arch under Federal Rule of Civil Procedure 11. Doc. 28 at 30-31; Doc. 50, *passim*.

## II. Applicable Law

A defendant may remove from state court to federal court any civil action over which the federal district court would have original jurisdiction. 28 U.S.C. § 1441(a). As pertinent here, a federal court may exercise diversity jurisdiction pursuant to 28 U.S.C. § 1332 where the amount in controversy exceeds $75,000 and there exists complete diversity of citizenship between adverse parties. 28 U.S.C. § 1332.

When removal is based on diversity of citizenship, 28 U.S.C. § 1446(c)(1) requires that the notice must be filed within "1 year after commencement of the action, unless the district court finds that the plaintiff has acted in bad faith in order to prevent a defendant from removing the action." The removing party bears the burden of establishing the facts necessary to show that federal jurisdiction exists and that removal was proper. *Manguno v. Prudential Prop. & Cas. Ins. Co.*, 276 F.3d 720, 723 (5th Cir. 2002); *St. Paul Reinsurance Co. Ltd. v. Greenberg*, 134 F.3d 1250, 1253 (5th Cir. 1998). "This extends not only to demonstrating a jurisdictional basis for removal, but also necessary compliance with the requirements of the removal statute." *Fort*

*Worth & W. R.R. Co. v. Stevenson*, No. 3:15-cv-906, 2015 WL 3867906, at *1 (N.D. Tex. June 22, 2015) (Boyle, J.) (internal citation and quotations omitted). "Because removal raises significant federalism concerns, the removal statute must be strictly construed and any doubt as to the propriety of removal should be resolved in favor of remand." *Gutierrez v. Flores*, 543 F.3d 248, 251 (5th Cir. 2008) (quotation marks omitted).

## III. Analysis

### A. Motion to Remand

Arch acknowledges that its Notice of Removal was filed more than one year after the commencement of this action in state court. *See* Doc. 1 at 5. Indeed, Arch did not seek removal until October 16, 2025, nearly two years after Plaintiff initiated the case on October 18, 2023, and well beyond Section 1446(c)(1)'s one-year limitation. Therefore, the Court must remand the action unless it finds that Plaintiff acted in "bad faith" to prevent Arch's removal. 28 U.S.C. § 1446(c)(1); *see also Boney v. Lowe's Home Centers, LLC*, No. 3:19-cv-1211, 2019 WL 5579206, at *1 (N.D. Tex. Oct. 29, 2019) (Scholer, J.) ("Because more than one year elapsed between commencement of the action and the date of removal, the Court *must* remand unless it finds 'bad faith.'") (emphasis added).

Arch argues that Plaintiff engaged in bad faith when, at the outset of this action, it asserted claims against excess insurers Arch and Landmark, together with its claims against the Primary Insurers. Doc. 1 at 6-7. According to Arch, Plaintiff knew that the excess policies issued by Arch and Landmark afforded coverage only after the primary insurers paid or admitted liability for the full amount of their policy limits. Doc. 1 at 7. Because those conditions precedent had not been satisfied when the action was filed, Arch argues that Plaintiff

"improperly combined a hypothetical, contingent, and premature lawsuit against its excess carriers" with its ripe claims against the primary insurers "in order to start the one-year clock ticking" and prevent later removal of the action. Doc. 1 at 6.

Although the Court of Appeals for the Fifth Circuit has not extensively defined "bad faith" under § 1446(c)(1), courts within this circuit have generally construed it to include circumstances in which a plaintiff "attempts to 'manipulate the statutory rules . . . thereby preventing [a] defendant from exercising its rights.'" *Kruger v. Altom Transp., Inc.*, No. 1:24-cv-528, 2025 WL 1085220, at *3 (E.D. Tex. Apr. 10, 2025) (Crone, J.); *see also Boney*, 2019 WL 5579206, at *2 (collecting cases and observing that the inquiry focuses on "whether the plaintiff's conduct indicates manipulation of the removal statute."). As one court has explained, "[c]onduct rises to the level of bad faith when a party makes a transparent attempt to avoid federal jurisdiction." *Kidwai v. Fed. Nat'l Mortg. Ass'n*, No. 13-cv-972, 2014 WL 252026, at *2 (W.D. Tex. Jan. 22, 2014) (Rodriguez, J.) (internal quotations and citations omitted). Accordingly, the primary question is "what motivated the plaintiff in the past—that is, whether the plaintiff's litigation conduct meant to 'prevent a defendant from removing the action.'" *Hoyt v. Lane Constr. Corp.*, 927 F.3d 287, 293 (5th Cir. 2019), *as revised* (Aug. 12, 2019) (citation omitted) (emphasis in original).

"Courts must determine whether bad faith exists on a case-by-case basis, balancing the bad-faith exception against 'the general rule that removal jurisdiction is to be strictly construed [in favor of remand], . . . .'" *Boney*, 2019 WL 5579206, at *1 (citations omitted). Although the determination is ultimately left to the court's discretion, courts are reluctant to find bad faith absent "clear and convincing proof." *Id.* at *2; *Rantz v. Shield Coat, Inc.*, Civ. A. No. 17-3338,

2017 WL 3188415, at *5 (E.D. La. July 26, 2017) (Africk, J.). Therefore, "[a] defendant seeking to escape § 1446(c)(1)'s general prohibition must satisfy a high burden of proof to be entitled to the application of the bad faith exception," by showing that the plaintiff acted in bad faith in order to prevent removal. *Kruger*, 2025 WL 1085220, at *3 (citing *Holman v. Fiesta Mart, L.L.C.*, No. 3:24-cv-212, 2024 WL 2001574, at *3 (N.D. Tex. May 6, 2024) (Fish, J.)).

Upon review of the record and the parties' arguments, the Court finds that Arch has failed to meet this burden. As Plaintiff points out, the Original Petition alleged more than $34 million in covered damages—an amount that facially exceeds the primary insurance limits and reaches Arch's excess coverage layer. Doc. 28 at 5; *see also* Doc. 2-1 at 20 [Pl.s' Original Pet.].

Although Arch does not dispute that the alleged damages, if awarded, would reach its policy threshold, it nevertheless maintains that Plaintiff could not assert claims against it in good faith until the primary insurers had either paid or admitted liability for the full amount of their policy limits. Doc. 1 at 7. Arch, however, has not identified any authority holding that exhaustion of a primary policy is a condition precedent to the assertion of claims against an excess insurer. On the contrary, courts have routinely permited insureds to pursue claims against both primary and excess insurers in a single action, even when the primary policies have not yet been exhausted. See, e.g., *Vision I Homeowners Ass'n v. Aspen Specialty Ins. Co.*, 674 F. Supp. 2d 1328, 1332 (S.D. Fla. 2009) (rejecting argument that insured was precluded from bringing suit against excess insurer before exhaustion of the primary policy and holding that the exhaustion provision "merely creates a condition precedent to liability[,] not a condition precedent to litigation."); *Felman Prod., Inc. v. Indus. Risk Insurers*, No. CIV.A. 3:09-481, 2009 WL 5064058, at *3 (S.D.W. Va. Dec. 16, 2009) (Chambers, J.) (holding that an insured's claims

against its excess insurer were ripe before exhaustion of the primary policy where the alleged loss exceeded the primary policy limits and the insured had tendered a claim under the excess policy); *Travelers Prop. Cas. Co. of Am. v. H.E. Sutton Forwarding Co.,* 620 F. Supp 3d 1165, 1170 (M.D. Fla. 2022) (duty to defend claim against excess insurer was ripe despite lack of exhaustion of underlying policy where excess insurer formally denied coverage in the underlying action).

Arch's argument is also at odds with the approach typically advanced by excess insurers in similar coverage disputes. Indeed, excess insurers routinely seek to intervene in actions between insureds and primary insurers before the primary policies are exhausted, and courts regularly grant such requests, recognizing that excess insurers have a cognizable interest when resolution of primary coverage issues may trigger or define their obligations.[3] *See, e.g., Everest Indem. Ins. Co. v. Jake's Fireworks, Inc.,* 335 F.R.D. 330, 333 (D. Kan. 2020) (permitting intervention where potential damages exceeded the primary policy limits because resolution could trigger the excess insurer's coverage obligations); *Liberty Mutual Fire Ins. Co. v. Lumber Liquidators, Inc.*, 314 F.R.D. 180, 185 (E.D. Va. 2016) (same); *Felman Prod., Inc. v. Indus. Risk*

[3] Although these opinions appear to clearly contradict Arch's position, the Court notes that Landmark is in a somewhat different position given that neither Plaintiff's Original nor First Amended Petition alleged damages exceeding Arch's excess layer and potentially implicating Landmark's second excess policy. *See* Doc. 2-1 at 20 (alleging losses to the Hotel to be between $34 and $38 million); Doc. 2-1 at 148 (same). Landmark therefore would appear to have the stronger argument of the two. *See, e.g., Solomon Senior Living Holdings, LLC v. Nat'l Union Fire Ins. Co. of Pittsburg, PA*, No. 1:20-cv-2756, 2021 WL 9721283, at *9-10 (N.D. Ga. Mar. 31, 2021) (Pannell, J.) (dismissing claims against an excess insurer at the 12(b)(6) stage where exhaustion of primary coverage was a condition precedent to coverage and the plaintiffs' own allegations established that their losses were "far less than the [amount] required to trigger the Excess Coverage provision."). Nevertheless, because Landmark neither advances this argument here nor joins in Arch's opposition, the Court need not consider its position on this issue.

*Insurers*, No. CIV.A. 3:09-481, 2009 WL 5064058, at *3 (S.D.W. Va. Dec. 16, 2009) (finding a "significantly protectible interest" and allowing intervention where the alleged damages potentially implicated the excess policy). Citing the preceding cases, the undersigned recently reached the same conclusion, holding that an excess insurer possessed a "direct, substantial, [and] legally protectable interest" in a coverage dispute between the insured and its primary insurers, even though the primary policy had not yet been exhausted. *See Hartford Underwriters Ins. Co. v. Dunhill Partners, Inc. et al.,* No. 3:25-cv-357 (N.D. Tex.), Dkt No. 49 at 6 (Toliver, J.).

Moreover, while Arch makes much of the state court's December 2024 Abatement Order, it fails to explain how the abatement establishes Plaintiff's bad faith or otherwise exempts it from § 1446(c)'s deadline. Doc. 39 at 23. Even assuming that Plaintiff's claims against Arch were unripe when this action was filed, that fact alone would not establish that Plaintiff asserted those claims in bad faith—that is, for the purpose of defeating diversity. *See Rantz*, 2017 WL 3188415, at *6 n.29 (observing that "[a]n unsuccessful claim is not necessarily brought in bad faith."); *Kruger*, 2025 WL 1085220, at *5 (recognizing that "[al]though a finding of improper joinder may, in some instances, provide evidence of bad faith, it is not dispositive of the issue."). Instead, Arch must point to some evidence demonstrating that Plaintiff "engaged in *deliberate* conduct to prevent removal." *Kruger*, 2025 WL 1085220, at *3 (emphasis added).

The only conduct Arch identifies as evidencing Plaintiff's strategic intent is the evolution of Plaintiff's pleadings. Doc. 39 at 23. Specifically, Arch emphasizes that Plaintiff affirmatively alleged both at the outset of the case and in its First Amended Petition, that the case was not removable because diversity jurisdiction was lacking. Doc. 1 at 6-7 (citing Doc. 2 at 5 [Pl.s'

Original Pet.]; Doc. 2 at 134 [Pl.s' First Am. Pet.]). After the diversity-destroying parties were nonsuited, however, Plaintiff omitted that allegation from its Second Amended Petition, instead alleging that the remaining defendants "may not remove this case because more than one year has passed since [its] commencement." Doc. 39 at 23 (citing Doc. 20-1 at 3). Arch contends that this change "conclusively establishes" that Plaintiff's conduct was designed from the outset to prevent the eventual removal of its claims against the excess insurers. Doc. 1 at 8.

The Court is unpersuaded. Plaintiff's decision to invoke § 1446(c)'s one-year bar, although ultimately unsuccessful in preventing removal, is not inherently indicative of bad faith. Indeed, if Plaintiff believed—as it now contends—that removal was procedurally barred, it would seemingly have little reason to continue to allege the absence of complete diversity at that stage in the litigation. Thus, that Plaintiff decided to avoid the more burdensome task of tracing its citizenship through its multi-tiered ownership structure does not, without more, support an inference of procedural manipulation.

Nor does the remainder of the record support such an inference. On the contrary, the record reveals that Plaintiff diligently pursued its claims against all insurers, including Arch, before entry of the Abatement Order. During the first year of the litigation, Arch participated in ten depositions, exchanged written discovery and engaged in discovery-related disputes, designated experts, and participated in mediation. Doc. 28 at 11; *see, e.g.,* Doc. 2 at 906-37 [Hr'g Trns.]; Doc. 2 at 440-51 [Arch's Responses to Pl.s' Requests for Production]; Doc. 2 at 949-65 [Arch's Second Supplemental Responses]. Plaintiff also adamantly opposed Arch's requests for dismissal or abatement and repeatedly represented that it was prepared to proceed to trial against both Arch and Landmark. *See* Doc. 29-18 at 7 [Hr'g Trns. 6:6-7]; Doc. 29-20 at 2-3.

These circumstances bear little resemblance to those in cases in which courts have found bad faith. *See, e.g., Elsholtz v. Taser Int'l, Inc.*, 410 F. Supp. 2d 505, 506-07 (N.D. Tex. 2007) (finding equitable tolling of one-year removal period warranted where the plaintiff repeatedly requested continuances for hearing on the non-diverse defendant's plea to the jurisdiction and nonsuited that defendant only after the removal deadline expired); *Lawson v. Parker Hannifin Corp.*, No. 4:13-cv-923, 2014 WL 1158880, at *5-6 (N.D. Tex. Mar. 20, 2014) (O'Connor, J.) (finding circumstances warranted bad-faith exception where the plaintiff failed to serve discovery, notice deposition, or take a default judgment against the nondiverse defendant before nonsuiting him shortly after expiration of the one-year removal period).

Arch therefore has not met its high burden of demonstrating that Plaintiff acted in bad-faith to prevent removal, such that the exception applies to toll § 1446(c)(1)'s one-year removal period. Accordingly, because Arch's removal was untimely, Plaintiff's motion should be granted as to remand.

**B. Attorneys' Fees and Motion for Sanctions**

Having determined that remand is proper, the Court next considers Plaintiff's requests for costs and expenses incurred in connection with its motion, and for sanctions pursuant to Federal Rule of Civil Procedure 11. See Doc. 28 at 30-31; Doc. 50, *passim*.

Under 28 U.S.C. § 1447(c), a district court may award "just costs and any actual expenses, including attorney fees, incurred as a result of improper removal." *Valdes v. Wal-Mart Stores, Inc.*, 199 F.3d 290, 292 (5th Cir. 2000). The "mere determination that removal was improper," however, does not automatically entitle the prevailing party to an award of attorney's fees. *Id.* (noting that "[t]here is no automatic entitlement to an award of attorney's fees.").

Rather, attorney's fees should be awarded only where the removing party lacked "objectively reasonable grounds to believe the removal was legally proper." *Id.* at 294; *Martin v. Franklin Cap. Corp.*, 546 U.S. 132, 141 (2005). Whether removal was objectively reasonable is evaluated based on the circumstances existing at the time of removal; the removing defendant's motive is irrelevant. *Valdes*, 199 F.3d at 292.

In addition to attorneys' fees, a court may impose sanctions on a defendant for improper removal pursuant to Rule 11 of the Federal Rules of Civil Procedure. Rule 11 provides, in pertinent part, that by presenting a motion to the court, an attorney certifies that to the best of their knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:

> (1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; [and]
>
> . . .
>
> (3) the factual contentions have evidentiary support, or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation.

FED. R. CIV. P. 11(b)(1)-(3).

Plaintiff contends that an award of attorneys' fees and Rule 11 sanctions against Arch are warranted because Arch's removal was legally meritless, procedurally flawed, and was filed solely for purposes of delaying the impending state-court trial. Doc. 50 at 5-6. Specifically, Plaintiff argues that Arch's removal was objectively unreasonable because an adequate investigation into Plaintiff's citizenship would have revealed that one of its members shares Arch's citizenship, thus defeating complete diversity. Doc. 50 at 16-18. Plaintiff further contends that, even if the diversity-destroying facts were not available to Arch prior to removal, Plaintiff has since provided Arch and the Court with "unequivocal proof" establishing the

absence of complete diversity. Doc. 50 at 20. According to Plaintiff, Arch's continued assertion that federal jurisdiction exists, "despite conclusive proof to the contrary, manifests its dilatory purposes." Doc. 50 at 8.

Although the Court ultimately concludes that Arch's removal was improper, it disagrees with Plaintiff's contention that the removal was "substantively baseless" under the circumstances. Doc. 50 at 21. Arch removed this action based on diversity jurisdiction, alleging that Plaintiff, through the citizenship of its members, was a citizen of Texas and Louisiana, while Arch and Landmark were citizens of different states. 28 U.S.C. § 1332(a); *see also Harvey v. Grey Wolf Drilling Co.*, 542 F.3d 1077 (5th Cir. 2008) (establishing that "the citizenship of a LLC is determined by the citizenship of all of its members."). In making this assertion, Arch relied on Plaintiff's repeated allegations in each of its three pleadings that its members were citizens of Texas and Louisiana. *See* Doc. 2-1 at 3; Doc. 2-1 at 132; Doc. 20-1 at 3.

While Plaintiff now faults Arch for relying on these allegations, nothing in the voluminous record indicated that there any reason to believe that these allegations were incomplete. Indeed, Plaintiff's motion to remand marked the first time Plaintiff asserted that one of its members, whose ownership interest is held through a multi-tiered organizational structure, shares New Jersey citizenship with Arch. *See* Doc. 28.

Plaintiff contends that the timing of this assertion is irrelevant because it does not bear the burden of disproving diversity, either before or after removal. But while Plaintiff is correct that this burden falls on the removing party, Plaintiff "nevertheless has an obligation to provide accurate information when it does make statements about its own business structure in its petition." *Turner Bros. Crane and Rigging, LLC v. Kingboard Chem. Holding Ltd.*, No. 6-88,

2007 WL 2848154, at *6 (M.D. La. Sept. 24, 2007) (Parker, J.). Plaintiff's insistence that its prior allegations were nonetheless accurate because it never stated that its members "were *exclusively* citizens of Texas and Louisiana" likewise misses the point. Doc. 50 at 19 (emphasis in original). Such "linguistic gymnastics," as Arch aptly characterizes it, are what led Arch to believe that a basis for removal existed in the first place.

To be sure, Arch, as the removing party, had a duty to conduct at least a reasonable investigation prior to invoking this Court's diversity jurisdiction. The record, however, indicates that Arch did so by reviewing the pleadings as well as publicly available records in an effort to confirm Plaintiff's citizenship. *See* Doc. 39-3 at 2 [Decl. of Charlotte A. Fields]. Contrary to Plaintiff's assertion, the Court is not aware of any reasonable means by which Arch could have discovered the diversity-destroying member's indirect ownership interest through that investigation.[4] As the declaration of Charlotte A. Fields explains, the publicly available records maintained by the Louisiana Secretary of State for Plaintiff and its related entities do not reveal the ownership interest at issue. Doc. 39-3 at 4-5. Rather, the records appear to diverge from Plaintiff's asserted ownership structure at only the third tier, preventing a reasonable investigator

[4] Plaintiff contends that a simple Google search of the phrase "windsor court ownership" yields a series of six links, the sixth of which goes to an article establishing the diversity-destroying member's interest in the Hotel. Doc. 50 at 16-17. But even assuming the search consistently yields the same results—a fact which the Court questions in light of its own attempts—a single, 16-year-old local news article cannot reasonably be said to conclusively resolve the citizenship inquiry, particularly where this information was not corroborated by other publicly available records. *See, e.g.*, *Behringer Harvard Lake Tahoe v. Bank of Am., N.A.*, No. 3:13-cv-3040, 2014 WL 3670093 at *2 (N.D. Tex. July 23, 2014) (Fish, J.) (finding documents were insufficient to establish an LLC's citizenship where they suggested only that certain individuals had been members "at some point," but did not establish that they remained both members and citizens of the relevant state as of the date diversity was determined).

from tracing the purported interests far enough to reach the diversity destroying member.[5] Because publicly available records did not contradict Plaintiff's allegations as to its own citizenship, Arch's reliance on those allegations was not objectively unreasonable.

Nor does the Court agree that Defendant acted unreasonably by continuing to oppose remand. Although Arch identified the above discrepancy on several occasions, (*see* Doc. 39-3 at 5, Doc. 41 at 16; Doc. 47 at 13), Plaintiff has offered no satisfactory explanation for the inconsistency despite filing extensive briefing and numerous supporting exhibits. Instead, Plaintiff's piecemeal production of partially redacted, nonpublic documents underscores that the jurisdictional issue was not readily ascertainable before removal.

The Court does not overlook the fact that Plaintiff voluntarily produced these documents in an apparent effort to avoid judicial intervention. Nevertheless, in seeking more than $100,000 in attorneys' fees and costs, Plaintiff ignores its own role in prolonging the jurisdictional dispute. *See* Doc. 29-24; Doc. 29-25. Much of the time and expense Plaintiff attributes to Arch's improper removal could have been avoided had Plaintiff accurately and *completely* alleged its citizenship at the outset or in its Second Amended Complaint, or when challenged, supported its allegations with complete documentation.

---

[5] Both a Louisiana Secretary of State report filed on July 27, 2025, by Plaintiff's own declarant and a Louisiana Secretary of State online record search appear to contradict Plaintiff's purported ownership structure. *Compare* Doc. 48-4 at 13 [Windsor Court New Orleans, L.L.C. Annual Report] *and* La. Sec'y of State Rec. Search: Windsor Court New Orleans, L.L.C., https://coraweb.sos.la.gov/CommercialSearch/CommercialSearchDetails.aspx?CharterID=851497_56106E354D (last visited Aug. 3, 2026) [https://perma.cc/D6VB-QZ3M], *with* Doc. 29-1 at 3 [Decl. of Martha Heausler].

Under these circumstances, the Court cannot conclude that Arch lacked an objectively reasonable basis for removal. Accordingly, Plaintiff's request for attorneys' fees and costs and motion for sanctions should be **DENIED.**

## IV. CONCLUSION

For the foregoing reasons, Plaintiff's motion to remand, Doc. 28, should be **GRANTED** to the extent that this action should be **REMANDED** to the 134th District Court of Dallas County, Texas, for further proceedings. Plaintiff's request for attorneys' fees and costs and motion for sanctions, Doc. 50, should be **DENIED.**

**SO RECOMMENDED** on August 14, 2026.

RENEE HARRIS TOLIVER
UNITED STATES MAGISTRATE JUDGE

## INSTRUCTIONS FOR SERVICE AND NOTICE OF RIGHT TO APPEAL/OBJECT

A copy of this report and recommendation will be served on all parties in the manner provided by law. Any party who objects to any part of this report and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b). An objection must identify the finding or recommendation to which objection is made, state the basis for the objection, and indicate where in the magistrate judge's report and recommendation the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996), *modified by statute on other grounds*, 28 U.S.C. § 636(b)(1) (extending the time to file objections to 14 days).